UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KAREN CARLSON,

       Plaintiff,

v.                                               Case No. 8:05-cv-817-T-24MSS

LIBERTY MUTUAL INSURANCE
COMPANY,

       Defendant.

_____/

## ORDER

This cause comes before the Court on Defendant Liberty Mutual Insurance Company's

("Liberty Mutual") motion for summary judgment.  (Doc. Nos. 27, 28.)  Plaintiff Dr. Karen

Carlson opposes the entry of summary judgment, arguing that there are genuine issues of

material fact as to whether Liberty Mutual discriminated against her because of her disability and

gender in violation of the Florida Civil Rights Act, Fla. Stat. § 760.01 et seq. ("FCRA").  (Doc.

No. 33.)  For the reasons stated herein, Liberty Mutual's motion is hereby granted.

**I.**       **Facts and Procedural History**

Liberty Mutual is an insurance company providing workers compensation and disability

insurance, programs, and services.  (Doc. No. 33, Ex.8.)  Dr. David Deitz began working for

Liberty Mutual in 2001 as its National Medical Director.  (Deitz dep., p.8.)  In this position,

Deitz is responsible for medical management of claims for the commercial market division of the

company and supervises a staff of Regional Medical Directors ("RMDs") who provide medical

advice on those claims.  (*Id.*)

Before Deitz joined Liberty Mutual, there were only two full time RMDs, who

functioned primarily as medical consultants performing lengthy reviews on a limited number of

complicated cases.  (*Id.* at 10-11.)  These two RMDs did not travel to other offices and had very

little role in policy, training, or anything else within the organization.[1]  (*Id.*; Deitz aff., p.3.)  As

National Medical Director, Deitz restructured and expanded the function of RMDs by creating a

system of eight RMDs who were more involved in claims operations.  (*Id.* at 10-11.)  The

restructured position required RMDs to work from an assigned office, to assume more expansive

roles in training and developing nurses and case managers thereby developing close working

relationships with them, to develop medical policy, and to engage in sales and marketing.  (*Id.*;

Deitz aff., p.3.)

    In early 2003, Carlson applied for one of these restructured RMD positions in Tampa,

Florida.  (Pl.'s dep., p.33.)  During her interview, Deitz inquired how long the drive was between

Carlson's home in Lakeland and the office in Tampa.  (*Id.* at 38.)  Deitz wanted to ensure that

Carlson understood that the company needed the Tampa RMD to be present in the office on a

regular basis.  (Deitz aff., p.1.)  Deitz also asked several times whether Carlson would have

problems working with female nurses.  (Pl.'s dep., p.37.)  Carlson responded that she would not

---

[1]One of these two RMDs was Dr. Martin Sheehy, who was hired by Deitz's predecessor and was based out of the Phoenix, Arizona, office.  (Sheehy dep., p.6.)  After the restructuring, new RMDs were assigned to the offices that Sheehy had responsibility for and there were no longer nurse case managers or claims managers present in the Phoenix office.  (Deitz aff., p.3-4.)  Around 2003, Sheehy began experiencing health problems that prevented him from traveling.  (Sheehy dep., p.8.)  Deitz excused Sheehy from traveling and permitted him to work from home at times because Sheehy did not handle the high volume of complex files that the other RMDs handled, nor did he work with teams assigned to complex files.  (*Id.* at 10, 30-31; Deitz aff., p.3-4.)  Furthermore, the Phoenix office was much smaller than the Tampa office and there were no nurse case managers present there with whom Sheehy was required to interact.  (Deitz aff., p.4.)  In any event, Sheehy was required to work in the Phoenix office on a regular basis.  (Sheehy dep., p.32.; Deitz aff., p.4).

have any problem doing so.  (*Id.*)

Carlson began working as a RMD in the company's Tampa office in June 2003.  (*Id.* at 42.)  Her duties included: (1) being available as a resource for nurse case managers and claims adjusters; (2) answering medical questions; (3) working on clinical guidelines; (4) working on internal peer reviews and RMD consults; and (5) working with nurses on complex medical claims.  (*Id.* at 42-43.)  Carlson set aside regular "consult hours" on Mondays and Wednesdays to meet with her nurse case managers.  (*Id.* at 65.)  She also conducted a weekly meeting that lasted three to four hours to discuss complex medical claims.  (*Id.*)  Carlson acknowledged that part of her role as an RMD was that of a leader, and that leadership required her to interact with her peers and subordinates.  (*Id.* at 166.)  Carlson was also required to occasionally visit other company offices in the region.  (*Id.* at 43-44.)

During her employment with the company, Carlson was the only female RMD.  (Deitz dep., p.81.)  She felt that Deitz was more "chummy" with the male RMDs and that she was unfairly excluded from casual conversation with them.  (Pl.'s dep., p.175-76.)  In January 2004, it came to Carlson's attention that she did not receive important instructions regarding how to complete internal peer review reports, while the male RMDs did receive such information.  (*Id.* at 55-58.)  On two occasions, Deitz again asked Carlson whether she had difficulty working with female nurses.  (*Id.* at 171.)  Deitz did not pose this same question to Dr. Martin Sheehy or Dr. Michael Webb, two male RMDs.  (Sheehy dep., p.21-22; Webb dep., p.14.)

On October 13, 2003, Deitz sent an email to Carlson, expressing his concerns about her performance, specifically regarding her lack of communication with the nurses in her office.  (Pl.'s dep., p. 67, Ex.6.)  He indicated to her that there were problems in her office and that she

needed to make particular efforts to improve communication and "develop some working relationships." (*Id.* at 84, Ex.6.)  He also told her that she needed to be more accessible and suggested that she "walk the floor a few times a week and just ask[] what the nurses are working on–sit down and have a brief conversation . . . ." (*Id.* at 95; Ex.6.)  The two later discussed Deitz's concerns, and Carlson felt the issues were resolved.  (*Id.* at 54.)

In November 2003, Carlson had a seizure at work, which she did not disclose to anyone. (*Id.* at 108.)  She was diagnosed with epilepsy as a child, but this seizure came as a surprise because her condition had been controlled by medication for many years.  (*Id.* at 108-09.)  On February 4, 2004, Carlson had another seizure while at work.  (*Id.* at 107.)  Beginning the day after the February 4th seizure, Carlson worked from her home in Lakeland.  (*Id.* at 126.)

About a week later, Deitz called Carlson at home to express his concern and to inquire when she would be returning to the office.  (*Id.* at 127-28.)  Carlson requested that she be allowed to work from home until she obtained a clearance from her neurologist to drive.  (*Id.*) She also told Deitz that she "didn't feel comfortable returning to the Tampa office at that time" because she was embarrassed about the seizure.  (*Id.* at 130.)  Deitz was supportive and said that "not being able to drive didn't mean not being able to travel." (*Id.* at 128.)

Thereafter, Carlson had several discussions with Deitz and Sarah Burke of the company's human resources department regarding her return to the Tampa office.  (*Id.* at 134.)  Burke informed Carlson that she had researched public transportation options and suggested that Carlson take a taxi or bus.  (*Id.* at 75-76.)  Carlson herself researched her options and confirmed that there were buses and taxis available for travel from Lakeland to Tampa.  (*Id.* at 76-77.) However, she chose not use these forms of transportation to return to the Tampa office because,

even using the best possible combination of buses and taxis, this option would only allow her to be in the office between 10 a.m. and 3 p.m. each day.  (*Id.* at 77.)  According to Carlson, Deitz informed her that "[her] only option was eight hours a day in Tampa."  (*Id.* at 79-80.)  Carlson never offered to work between 10 a.m. and 3 p.m. because "[she] was under the impression . . . that [her] only option was [to work] eight hours a day in Tampa."  (*Id.*)

Burke then sent Carlson a letter confirming that the company would permit her to work from home for approximately six weeks, until March 19, 2004, but that she was expected to return to work in the office thereafter.  (*Id.* at 142-43; Ex.8.)  Burke explained that "working in the Tampa office and travel are essential functions of [Carlson's] position."  (*Id.* at 143, Ex.8.)  Burke required Carlson to provide documentation from her treating physician stating that it was safe for her to return to the workplace, drive, and travel. (*Id.*)  Carlson responded with a letter from her physician stating that it was safe for her "to return to the workplace and to travel," but that, pursuant to Florida law, she was prohibited from driving for a period of six months following the seizure on February 4th.  (*Id.* at 143-44, Ex.9.)  The physician did not impose any other restriction on Carlson in this letter.  (*Id*. at 144; Ex.9.)

In mid-March, Deitz again contacted Carlson to inquire about her return to work, at which point Carlson requested that she be allowed to work from home for six months.  (*Id.* at 134).  She claimed that the only way her seizures impacted her ability to work was that she could not "get into the office" because she "couldn't drive."  (*Id.* at 117.)  Otherwise, as long as she was taking her medications to prevent epileptic seizures, her epilepsy did not limit her ability to work.  (*Id.* at 188.)  She claimed that she "could have done everything from home that she did at the office."  (*Id.*)   Deitz, however, refused Carlson's request, explaining that he had "a vision"

for the company, that Carlson's absence from the Tampa office for six months did not fit within that vision, and that her presence in the Tampa office was an essential function of the RMD position. (*Id.* at 79-80). Therefore, Deitz informed Carlson that if she could not return to work at the Tampa office for six months, they would have to set a mutually agreeable separation date. (Pl.'s dep., p.134).

Carlson agreed to a separation date of April 16, 2004. (*Id.* at 44-45.) She worked the final two-and-one-half months of her employment with Liberty Mutual–from the day after the February 4th seizure until the date of her separation–from her home in Lakeland. (*Id.* at 164-65.) In September 2004, Liberty Mutual hired Dr. Michael Webb to fill Carlson's position. (Webb dep., p.5, 18.)

On June 25, 2004, Dr. Carlson filed a charge of discrimination against Liberty Mutual, alleging that the company discriminated against her because of her disability when it refused to reasonably accommodate her and terminated her employment. (Pl.'s dep., p.159, Ex.13.) Thereafter, on December 27, 2004, Carlson filed a second charge of discrimination, alleging gender discrimination. (*Id.* at 168-69; Ex.15.)

## II.    Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A moving party discharges its burden on a

motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. at 2554. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *See id.* When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. *Id.* at 324, 106 S. Ct. at 2553.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (per curiam). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

## III.   Discussion

Carlson alleges that Liberty Mutual discriminated against her on the basis of her disability and gender in violation of the FCRA. The FCRA makes it "an unlawful employment practice for an employer (a) to discharge . . . or otherwise discriminate against any individual

with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex, [or] handicap." Fla. Stat. § 760.10(1)(a). "Because Florida courts construe the FCRA in conformity with the [Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.], a disability discrimination cause of action is analyzed under the ADA." *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1175 (11th Cir. 2005) (quotations omitted). Similarly, decisions construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., are applicable when considering claims under the FCRA because the FCRA was patterned after Title VII. *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

To evaluate disparate treatment claims supported by circumstantial evidence, the Court uses the traditional *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), burden-shifting analysis. Under this framework, the plaintiff must raise an inference of discrimination by establishing a prima facie case of discrimination. *Id.* at 802, 93 S. Ct. at 1824. The burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the alleged discrimination. *Id.* Once the defendant produces such a reason, the plaintiff must then prove that the legitimate reason was a mere pretext for discrimination. *Id.* at 804, 93 S. Ct. at 1826. To avoid summary judgment, the plaintiff must produce sufficient evidence to show "that the employer intentionally discriminated against [her] because of [her] [protected characteristic]." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam).

### A.   Disability Discrimination

To establish a prima facie case of disability discrimination, a plaintiff must establish that: (1) she had a disability within the meaning of the ADA; (2) she was a "qualified individual,"

8

which is to say that she could perform the essential functions of her job with or without a

reasonable accommodation; and (3) she was discriminated against because of her disability.

*Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005); *D'Angelo v. Conagra*

*Foods*, 422 F.3d 1220, 1226 (11th Cir. 2005).   The ADA defines "disability" as: "(A) a physical

or mental impairment that substantially limits one or more of the major life activities of [an]

individual; (B) a record of such an impairment; or (C) being regarded as having such an

impairment."  42 U.S.C. § 12102(2).  "[M]ajor life activities" are defined as including "functions

such as caring for oneself, performing manual tasks, walking, seeing hearing speaking,

breathing, learning, and working."  29 C.F.R. § 1630.2(i).

> ### 1.    Carlson's Prima Facie Case
>
> #### a.    Whether Carlson was Disabled

Relying on *Chenoweth v. Hillsborough County*, 250 F.3d 1328 (11th Cir. 2001), Liberty

Mutual argues that Carlson does not have an impairment that substantially limits a major life

activity.  In that case, the Eleventh Circuit considered "whether inability to drive to work for six

months qualifies as an impairment substantially limiting a major life activity."  *Id.* at 1328.  As

in this case, the plaintiff sued her employer after she was denied permission to work from home

for a period of six months after having an epileptic seizure.  *Id.*  The court ruled that driving is

not a major life activity for purposes of the ADA.  *Id.* at 1328-30.  The court further ruled that

because the plaintiff produced no evidence that she was, in fact, unable to perform her job, the

plaintiff was not disabled.  *Id.* at 1330.

Here, Carlson does not dispute that driving is not a major life activity.  Rather, citing

statements from her affidavit, Carlson argues that she suffered from a complete loss of function,

including "loss of memory, confusion, and difficulty communicating" as a result of her epilepsy. (Doc. No. 33, p.13-14; Pl.'s aff.)  Apparently–although it is not clear from her affidavit or responsive pleading–Carlson purports that this complete loss of function impacted her major life activity of working.  Carlson's deposition testimony, however, contradicts this position.  At her deposition, Carlson admitted that the only way her epilepsy impacted her ability to work was that she could not "get into the office" because she "couldn't drive."  (Pl.'s dep., p.117.)  In fact, she testified that, as long as she was taking her medications to prevent epileptic seizures, her epilepsy did not limit her ability to work.  (*Id.* at 188.)

"A party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by . . . filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S. Ct. 1597, 1603, 143 L. Ed. 2d 966 (1999).  Carlson does not attempt to explain in any way the disparity between her deposition and affidavit.  Moreover, in her affidavit, Carlson did not go so far as to purport that her "loss of memory, confusion, and difficulty communicating" impacted her ability to work.  Accordingly, because Carlson produced insufficient evidence that she was limited in the major life activity of working, and because driving is not a major life activity, she failed to raise a genuine issue of material fact as to whether her epilepsy substantially limits her ability to work.  *See D'Angelo,* 422 F.3d at 1227; *Chenoweth,* 250 F.3d at 1330.[2]

_____

[2]Carlson argues that she has a "disability" both in the sense defined in § 12102(2)(A)–an actual impairment substantially limiting her in a major life activity–and in the sense defined in § 12102(2)(C)–"being regarded as having such an impairment."  Carlson does not dispute Liberty

**b.      Whether Carlson Could Perform the Essential Functions of Her Job With or Without a Reasonable Accommodation**

Furthermore, Carlson failed to raise an issue of fact as to whether she could perform the essential functions of her job with or without a reasonable accommodation. Essential functions are "the fundamental job duties of the employment position the [disabled employee] holds . . . ." 29 C.F.R. § 1630.2(n)(1). "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001). In conducting this inquiry, "'consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description . . . , this description shall be considered evidence of the essential functions of the job.'" *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)). Moreover, the term "reasonable accommodation" may include "job restructuring, [or] part-time or modified work schedules." 42 U.S.C. § 12111(9)(B). However, an employer is not required to provide such an accommodation if it would impose an undue hardship on the employer's business operations. 42 U.S.C. § 12112(b)(5)(A).

Carlson contends that she would have been able to perform the essential functions of her job had she been granted the accommodation she requested, which was to work from home for six months. She purports that she was able to perform approximately 95% of her RMD duties

Mutual's position that she did not have a record of a substantial impairment to satisfy the second definition of "disabled," *see* § 12102(2)(B). Because the parties do not fully argue the merits of Carlson's record of impairment, the Court declines to consider this issue. The Court also declines to consider whether Liberty Mutual regarded Carlson as disabled because, as discussed, Carlson failed to raise a genuine issue of material fact as to whether she could perform the essential functions of her job with or without a reasonable accommodation, or whether Liberty Mutual discriminated against her because of her disability.

from home during her final two-and-one-half months of employment, and that her working from home during that period resulted in no adverse consequences for Liberty Mutual.  As further evidence of the fact that her presence in the Tampa office was not an essential function of the job, she notes that the RMD job description did not require any particular number of hours in the office, and that another RMD, Dr. Martin Sheehy, was permitted to work from home.

Summary judgment is appropriate here because, despite Carlson's argument to the contrary, her presence in the Tampa office was an essential function of her job as RMD, and permitting her to work from home for six months was not a reasonable accommodation.  The undisputed evidence shows that Carlson was required to interact with, be available as a resource for, and train the nurse case managers and claims adjusters working in the Tampa office.  To fulfill this role, Carlson conducted lengthy weekly meetings and semiweekly "consult hours" with these individuals.  Carlson herself acknowledged that her job required leadership, and that in order to lead, she was required to interact with her peers and subordinates.  In his October 2003 email, Deitz reiterated the importance of Carlson's in person contact with the nurse case managers.  He encouraged her to develop working relationships with them and even suggested that she "walk the floor a few times a week" and "ask[] what the nurses are working on."  The evidence further shows that Sheehy's position as an RMD in Phoenix was distinct from Carlson's position in Tampa.  Sheehy was hired by Dietz's predecessor before the RMD position was restructured.  His presence in the Phoenix office was not necessary because there were no longer nurse case managers or claims managers located there with whom he would be required to interact.

12

"Generally, an employer is not required to accommodate a disability by allowing the disabled worker to work from home." *Paleologos v. Rehab Consultants*, 990 F. Supp. 1460, 1467 (N.D. Ga. 1998) (ruling that the plaintiff's "inability to attend work on a regular basis" rendered her unqualified for a position that required supervising other employees); *see also, Whillock v. Delta Air Lines*, 926 F. Supp. 1555, 1564 (N.D. Ga. 1995) (ruling that working from home was not a reasonable accommodation, when in person training, monitoring, evaluating, and counseling were essential to the plaintiff's job).  This is particularly true in this case, given Carlson's responsibility for interacting with, training, and acting as a resource for nurse case managers present in her office.  Accordingly, Carlson failed to raise a genuine issue of material fact as to whether she could perform the essential functions of her job with or without a reasonable accommodation.

> **c.     Whether Liberty Mutual Discriminated Against Carlson Because of Her Disability**

Likewise, Carlson did not sustain her burden of showing that Liberty Mutual failed to accommodate her and terminated her because of her disability.  Specifically, Carlson presented no evidence that the company prohibited her from working from home and terminated her employment for any other reason than the fact that her presence in the Tampa office was required in order to fulfill her job functions.  Indeed, Carlson does not dispute that her presence in the office was necessary to be a leader to her peers and subordinates.  Accordingly, Liberty Mutual is entitled to summary judgment on Carlson's disability discrimination claim because she has failed to present sufficient evidence to raise an issue of fact concerning her prima facie case.

> **2.     Liberty Mutual's Legitimate Nondiscriminatory Reason**

Furthermore, even if Carlson established a prima facie case of disability discrimination,

13

summary judgment is appropriate because she failed to prove that Liberty Mutual's legitimate, nondiscriminatory reason for refusing her accommodation and for terminating her was pretextual.  As its legitimate nondiscriminatory reason, Liberty Mutual proffered that Carlson's RMD position required her presence in the Tampa office.  The company argued that Carlson needed to be viewed as a team member with, be accessible to, and train the adjusters and nurses in her office, be more involved with the medical aspects of claims on a daily basis, and have access to large files.   Liberty Mutual's burden is merely one of production, not persuasion.  *Hall v. Ala. Ass'n of Sch. Bds.*, 326 F.3d 1157, 1166 (11th Cir. 2003) (per curiam).  Assuming Carlson established a prima facie case, the company's proffered reasons would eliminate the presumption of discrimination and shift the burden to Carlson "to come forward with sufficient evidence to permit a reasonable factfinder to find that those reasons were prextual."  *Chapman v. AI Transport*, 229 F.3d 1012, 1028 (11th Cir. 2000) (en banc).

### 3.    Carlson's Evidence of Pretext

As evidence of pretext, Carlson argues that the company offered different and contradictory reasons for its decision not to accommodate her and to terminate her employment. According to Carlson, when she first asked for the accommodation, Deitz simply stated that her working from home did not fit within his "vision" for the company.  It was not until after she filed her charge of discrimination that Deitz explained that his decision was based upon her problems interacting with coworkers in the Tampa office and the fact that her office had a large number of complex files.  As further evidence of pretext, Carlson notes that Liberty Mutual did not terminate her immediately upon her request for accommodation, but waited until after she fulfilled the essential functions of her job for six weeks.

14

This evidence is insufficient to show that Liberty Mutual's reasons for were pretextual. *See Willis v. Conopco., Inc.*, 108 F.3d 282, 287 (11th Cir. 1997) (ruling that summary judgment was proper when the plaintiff failed to offer evidence to raise an inference that the defendant's articulated explanation for her termination was pretextual). Deitz's statement that Carlson was having problems interacting with coworkers and that there were many complex files in Tampa does not contradict, but rather explains, his position that Carlson's presence in the office was required. Furthermore, as discussed above, Carlson failed to show that she was able to perform the essential functions of her job from home.

### B.      Gender Discrimination

Carlson also alleges that Liberty Mutual prohibited her from working from home for six months and terminated her employment because of her gender. To establish a prima facie case of gender discrimination, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) her employer treated a similarly-situated employee outside her protected class more favorably. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004); *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). The parties do not dispute that Carlson is a member of a protected class or that she was subjected to an adverse employment action.[3]

---

[3]Liberty Mutual argues in a conclusory fashion that Carlson was not qualified for the position as an RMD because she could not or would not work in the office for a period of six months. The company does not cite any authority to support its position that a plaintiff's temporary inability to be present in the office renders her disqualified for purposes of a prima facie case of gender discrimination. Carlson responded in a similarly generalized manner. Because the parties do not fully argue the merits of Carlson's qualification, the Court hereby declines to rule on this issue.

1.      **Carlson's Prima Facie Case**

Carlson asserts that three similarly-situated male RMDs, Drs. Martin Sheehy, Scott Edwards, and William Gaines, were treated more favorably than her. She argues that Liberty Mutual accommodated Sheehy's medical limitations by permanently relieving him of some of his RMD duties, when it refused to accommodate her under similar circumstances. As to Scott Edwards and William Gaines, she asserts that the company allowed them to continue working as RMDs despite their failure to complete RMD duties and their below average performance.

Summary judgment is appropriate as to this claim because Carlson has failed to establish a prima facie case. "To show that employees are similarly situated, the plaintiff must show that the employees are similarly situated in all relevant aspects." *Knight v. Baptist Hosp., Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) (citations and quotations omitted). Here, Liberty Mutual presented uncontroverted evidence that it relieved Sheehy of his traveling duties and at times permitted him to work from home because his position was different from other RMDs. He was not responsible for the high volume of complex files that the other RMDs handled, nor did he work with teams assigned to complex files. Moreover, his presence in the Phoenix office was not necessary because, unlike the Tampa office, the Phoenix office did not house nurse case managers with whom a RMD would ordinarily work and train. In any event, Sheehy was expected to work from the office every day, with the exception of the occasional times Deitz permitted him to work from home. Consequently, Carlson failed to show that they were "similarly situated in all relevant respects." *See Knight*, 330 F.3d at 1316.

Nor did Carlson establish that either Scott Edwards or William Gaines were similarly-situated comparators. "In determining whether employees are similarly situated, it is necessary

16

to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* (quotations and alterations omitted).  In this context, courts "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).   Carlson is apparently arguing that, like her, Edwards and Gaines should have been terminated because of their poor performance and failure to satisfy RMD duties.  Yet, Carlson failed to present any evidence that either one of them could not work from their respective offices.  Rather, she merely presented documentation of their performance issues, which were unrelated to their ability to be present in the office.  The Court will not second guess Liberty Mutual's decision not to terminate Edwards and Gaines because their alleged performance issues were not "nearly identical" to Carlson's inability to drive to work.  *See id.*  To compare Carlson's employment with these two comparators' employment is to "confus[e] apples with oranges." *See id.* Accordingly, Carlson's "opinion [that she was discriminated against because of her gender], without more, is not enough to establish a prima facie case of [gender] discrimination." *Holifield*, 115 F.3d at 1564.

### 2.      Liberty Mutual's Legitimate, Nondiscriminatory Reason

As its legitimate, nondiscriminatory reason for its challenged employment decisions, Liberty Mutual again proffers that Carlson's RMD position required her presence in the Tampa office.  Assuming Carlson established a prima facie case of gender discrimination, this proffered reason would eliminate the presumption of discrimination and shift the burden to Carlson to put

forth evidence to find that the company's reasons were pretextual.  *See Chapman*, 229 F.3d at

1028.

### 3.      Carlson's Evidence of Pretext

As evidence of pretext, Carlson argues that Deitz repeatedly questioned whether she had

problems working with female nurses, that Deitz was "chummy" with the male RMDs, that she

was excluded from casual conversations with male RMDs, that once she did not receive

important information regarding internal peer review reports, and that she was the only female

RMD.  "[C]onclusory allegations of discrimination, without more, are not sufficient to raise an

inference of pretext or intentional discrimination where [an employer] has offered . . . extensive

evidence of legitimate, non-discriminatory reasons for its actions."  *Grigsby v. Reynolds Metals

Co.,* 821 F.2d 590, 597 (11th Cir. 1987).  Carlson provided no evidence other than her sheer

speculation that Deitz treated her differently–by his "chummy" behavior, by excluding her from

casual conversation, or by once failing to give her important information–because of her gender.

"A plaintiff must show . . . that the defendant's employment decisions . . . were in fact motivated

by [gender]."  *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) (per curiam).

Furthermore, Carlson's argument that the fact that she was the only female RMD is evidence of

Deitz's discriminatory motive is belied by the fact Deitz himself interviewed and hired her.

Finally, although Deitz's gender-related questions to Carlson about working with female nurses

might have contributed to a circumstantial case of pretext, his questions are insufficient to raise

an issue of fact on pretext when Carlson has not put forth any other evidence of discriminatory

motive.  *See Rojas v. Fla.*, 285 F.3d 1339, 1342 (11th Cir. 2002) (per curiam).

IV.     **Conclusion**

        In conclusion, viewing the entirety of the record in the light most favorable to Carlson,

there are no genuine issues of material fact as to Carlson's disability and gender discrimination

claims.  Accordingly, the Court hereby GRANTS Liberty Mutual's motion for summary

judgment.  The Clerk is directed to enter judgment in favor of Liberty Mutual and to close the

case.  The Final Pretrial Conference in this case scheduled for Thursday, October 5, 2006, is

hereby cancelled.

        **DONE AND ORDERED** at Tampa, Florida, this 2nd day of October, 2006.


                                                SUSAN C. BUCKLEW
                                                United States District Judge

Copies to:
Counsel of Record

19